No. 25-1887

(8:24-cv-03198-TDC)

_____

In The
**United States Court of Appeals**
For the Fourth Circuit

_____

ALLISON BROWN,

*Plaintiff-Appellant*,

v.

WASHINGTON UNIVERSITY, Et al.,

*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

_____

**INFORMAL REPLY BRIEF OF APPELLANT**
_____

Allison Brown
6405 Chew Road
Upper Marlboro, MD 20772
E-mail: asb151@georgetown.edu

**TABLE OF CONTENTS**

TABLE OF CASES AND AUTHORITIES…………………………..……….. 1

PRELIMINARY STATEMENT ...………………………………………….. 4

EXECUTIVE SUMMARY……..……………………………………….…. 4

FACTUAL BACKGROUND…………………………………………….…. 5

SUMMARY OF FACTUAL ERRORS AND OMISSIONS…………………….. 10

SUMMARY OF ARGUMENT……………………………...……………12

ARGUMENT ……………………………………………..……………... 14

I.    The District Court and Appellees Erred in Ignoring Ford v. Montana Eighth Judicial District Court, 592 U.S. 351 (2021) ("*Ford*")

II.   The District Court and Appellees Erred in Finding that Appellees' Solicitation of NIH Did Not Relate to Appellant's Claims

III.  The District Court and Appellees' Erred in Not Considering Appellant's Extensive In-Person Contacts Because They Were Not in Maryland

IV.   District Court and Appellees Erred in Stating that *Calder*'s Effect Test Requires That Appellees Engage in Tortious Conduct in Maryland
      A. The District Court Erred in Not Recognizing That Any Efforts by WashU to Collect Tuition From Appellant Would Subject Them To Maryland Jurisdiction Under *Calder*
      B. The District Court Erred in Not Recognizing That Any Efforts by WashU to Fraudulently Expel Appellant Would Subject Them To Maryland Jurisdiction Under *Calder*

V.    The District Court Erred in Finding that Appellant's Move to Missouri was Unilateral, that Appellant's Suspension Was Limited to Appellees' Campus Only, and that the Vast Majority of the Appellees /WashU Conduct Underlying Brown's Claims Occurred in Missouri and Not Maryland

VI.   The District Court Did Find that Appellant Pleaded Sufficient Facts to Show Evidence of a Conspiracy

VII.  Appellant Respectfully Requests that the language "Under Maryland Long Arm Statute S 6-103(b)(6)" Be Removed from the title of Section

V of her Informal Brief. It was an Editing Error and Should Have Been Discussed As Relating to Jurisdictional Discovery.

VIII.   The District Court Erred in Not Allowing Jurisdictional Discovery

IX.    The District Court Should Not Have Allowed Appellees to Escape Accountability By Transferring this Case to the United States District Court for the Eastern District of Missouri, part of the 8th Circuit

X.     The Case Law Regarding Personal Jurisidction in Existence is Inadequate to Address Appellant's Civil Rights Claims, the History and Reality of Racial and Sexual Violence, Fear and Retaliation Regarding Personal Jurisdiction

CONCLUSION ……………………………………………………………. 34

STATEMENT REGARDING COUNSEL REQUEST…………….……….. 35

CERTIFICATE OF COMPLIANCE ……………………….…………….... 36

APPENDIX TABLE OF CONTENTS……………………...………………. 37

APPENDIX A……………………………………………………………… 38

APPENDIX B……………………………………………………………… 39

APPENDIX C……………………………………………………………… 40

APPENDIX D……………………………………………………………… 43

APPENDIX E……………………………………………………………… 48

APPENDIX F……………………………………………………………… 49

APPENDIX G……………………………………………………………… 52

**Table of Cases and Authorities**

**Cases**

*ALS Scans, Inc. v Digital Service Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002)

*Calder v. Jones*, 465 U.S. 783, 790 (1984)

*Cassell v. Loyola Univ.*, 294 F. Supp. 622, 624 (E. D. Tenn. 1968)

*Carefirst of Md. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 402 (4th Cir. 2003)

*Citizens United v. FEC*, 558 U.S. 310,  (2010)

*Consulting Engineers Corp. v. Geometric Ltd.* is 561 F.3d 273 (4th Cir. 2009)

*Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.2d.3d 696,  700 (Mo. Ct. App. 2008)

*Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448 (4th Cir. 2000)

*Fields v. Sickle Cell Diseases Ass'n of Am., Inc.*, 376 F. Supp. 3d 647, 650, 652-654 (E.D.N.C. 2018)

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351(2021).

*Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003)

*Gehling v. St. George's Sch. of Med.*, 773 F2d 539, 541 (3d Cir. 1985)

1

*Gillis v. Principia Corp.*, 832 F.2d 865, 875 (8th Cir. 2016)

*Gillis v. Principia Corp.*, 111 F. Supp. 3d 978, 987 (E.D. Mo. 2015)

*Grayson v. Anderson*, 816 F.3d 262 , 266 (Mar 7, 2016)

*Harnett v. Duquesne University*, 897 F. Supp. 920 (D. Md. 1995)

*Helicopteros Nacionales v. Hall*, 466 U.S. 408 (1984)

*Hutton v. Davis*, 454 U. S. 370, 375 (1982) (per curiam)

*Khalil v. Chatham Coll.*, 391 F. Supp. 588 (S.D. Tex. 2005)

*King v. Rubenstein,* 825 F.3d 206, 214 (4th Cir. 2016)

*Lucero v. Curators of Univ. of Mo*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013)

*Martinez v. N. Ariz. Univ. ("NAU")*, 553 F. Supp. 3d 908, (D.N.M. 2021)

*Perdue Foods LLC*, 814 F. 3d 185, 189 (4th Cir. 2016)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*Ramirez-Fort v Marshall*, 456 F. Supp. 3d 361, 369 (D.P.R. 2020)

*Scherer v. Curators of Univ. of Missouri*, 152 F. Supp. 2d 1278, 1279-80, 1284-85 (D. Kan. 2001)

*Spencer v. Earley*, 278 F. App'x 254, 259-60 (4th Cir. 2008)

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 507 (2002)

*UMG Recordings, Inc. v. Kurbanov*, 963 F. 3d 344 (4th Circuit 2020)

*United States v. Brown*, 797 F. App'x 85, 89 (4th Cir. 2019)

*Vilchis v. Miami Univ. of Ohio*, 99 F. App'x 743, 744 (7th Cir. 2004)

*Walden v. Fiore*, 571 U.S. 277 (2014)

**Statutes**

28 U.S.C. § 1291

28 U.S.C. §1331

28 U.S.C. § 1332 (a)(2)

28 U.S.C. § 1367

28 U.S.C. § 1391(b)(2)

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)

## PRELIMINARY STATEMENT

Appellant hereby incorporates in its entirety and by reference Appellant's previous arguments and the record contained in the District Court of Maryland filings: including but not limited to: Plaintiff's original November 11, 2024 complaint (ECF Document 4), Plaintiff's Amended Complaint (ECF Document 48), Plaintiff's Memorandum in Support of Her Opposition to Defendant's Motion to Dismiss (ECF Document 39), and Plaintiff's Reply (ECF Document 58.)

## EXECUTIVE SUMMARY

Appellant is before the 4th Circuit, pleading for relief because of Appellees' initiation of debt collections actions in the state of Maryland against Appellant.

Appellees are, to this day, seeking to collect from Appellant, a Maryland citizen and taxpayer, the amount of Appellant's scholarship that they revoked in retaliation for Appellant's complaints of race and sex discrimination. As a result, Appellant has brought this action against Appellee, The Washington University[1].

---

[1] Appellant finds Appellee's response to Appellee's Motion to Change the Name of Lead Defendant to "Washington University" that "The Washington University" is the only legal name to be used in court proceedings after 9 months of litigation and only when before the 4th Circuit Court of Appeals when no one on Earth refers to Appellee as "The Washington University" duplicitous. If Appellee had simply admitted to the District Court that the proper legal entity to be sued was "The Washington University" EIN No. 43-065361, much of this confusion could have

4

**FACTUAL BACKGROUND**

Appellant hereby incorporates the District Court's findings of fact in their Memorandum Opinion, despite several material omissions in the same. Appellant is a Black woman from Maryland who was erroneously suspended from Washington University on November 4, 2022, after complaining of sex and race discrimination in connection with her education and employment.

Appellant was sanctioned for complaining of race and sex discrimination on her instagram in an June 2022 letter that was **addressed and sent to her in the state of Maryland**, alleging that she violated the University's privacy policy. (Appendix B) In reality, Appellant had taken a picture of her a classmate's racist diatribe (that was markedly similar to those of the white supremacists who used to send Appellant death threats when she was the most-read columnist of the Michigan Daily at the University of Michigan) on a Canvas Discussion Board online. **Appellees disciplined Appellant, in the summertime, while she was in**

---

been obviated. WashU's website states that it was named Washington University in 1857 and "in St. Louis" was added in 1976. There is no mention of the name "The Washington University" being used on that page, and Appellant, a WashU Law School Alumni, has never heard of anyone referring to WashU as "The Washington University."

**Maryland, for this complaint.** Shortly thereafter, Appellant began her second year of law school at Appellee University.

The District Court acknowledged the fact that Appellant was hired by Appellee Davis in September 2022. However, the purpose of Appellant's research under Appellee Davis was to incorporate the history of race and the law into the law curriculum at Appellee University. Therefore, Appellee's research and classroom academic discourse were inextricably intertwined in general, and for the purposes of determining personal jurisdiction over Appellees.

Appellant was suspended on November 4, 2022, two days after her research supervisor, Appellee Davis ran out of her "Race and the Law" classroom screaming that she "was Bull Connor, a white supremacist, and the KKK" and complained to Appellees Walsh and Osgood that Appellant posed a threat, and was disruptive to the University after Appellant simply stated "the classroom is the safest place for us to discuss linguistic racism."

Appellant's entire interaction with Appellee Davis was captured on tape recording - but Appellees have refused to produce the recording for any reason. Instead of producing the recordings of Appellant's classes where she was alleged to have violated the Student Conduct Code, **Appellees demanded that Appellant**

6

**leave the University, finish her degree elsewhere, and sign a release of all claims and non-disparagement agreement <u>or</u> participate in a student conduct board hearing, a sham proceeding and kangaroo court created with the sole purpose to further sanction or expel Appellant.**

Appellees also threatened Appellant with arrest, and said that Appellant could neither attend a showing of Black Panther at an off-campus, local AMC movie theater, nor maintain residence in her apartment pursuant to the Washington University Police Department's Off-Campus patrol zone. (ECF 48, Exhibit 77) Because Appellant's apartment was located in WashU police department's patrol zone, and the WashU police department has instituted an unconstitutional practice called "Wanteds" which allows the detention of anyone without probable cause or reasonable suspicion, Plaintiff was constructively evicted from her apartment, and fled the state of Missouri for her safety. (Memorandum Opinion, <u>Appendix D</u>)

Soon thereafter, Appellees offered Appellant, who had fled to the state of Maryland, a release of all claims and a non-disparagement agreement in order to drop the charges against Appellant. Appellant refused to sign Appellee's proffered contracts, because the non-disparagement agreement and release of all claims constituted an unconscionable waiver of Appellant's rights, and prohibited both

7

Appellant and her Maryland family members from filing any claims against Appellees for their campaign of race and sex discrimination against Appellant.

Appellee Walsh unsuccessfully argued before the Student Conduct Board that Plaintiff was disruptive in her classes and posed a threat to the University in general. Further, several of Appellee Walsh's witnesses in the Student Conduct Board complained about the fact that Appellant complained of race and sex discrimination. Despite the fact that Appellant repeatedly requested for the classroom tapes to be shown to the Student Conduct Board (as all of Appellant's classes were audio and video recorded, and were easily accessible by Appellees,) Appellant was suspended for a total of six months, and forced to participate in the hearing and complete her courses online in the state of Maryland. Appellee Walsh lost over 30% of Appellant's course recordings, causing her grades to suffer.

In May 2023, the Student Conduct Board found Plaintiff not responsible for any violations of the Student Conduct Code at Appellee University. And though Appellant repeatedly requested to have the Student Conduct Board hearing in person in Missouri, and to return to complete her degree, Appellees failed to give adequate assurances that Appellant would not be subject to more race and sex based retaliation if Appellant returned to St. Louis.

8

Appellant graduated from Washington University in St. Louis School of Law in May 2024. However, Appellant has not stepped foot in the state of Missouri or Washington University's campus since December 2022, because Appellees threatened Appellant with arrest. **While at Appellee University, Appellant spent a total of one year (12 months total) in the state of Missouri - and the remaining time maintaining residence in the state of Maryland while being suspended and finishing her degree at Georgetown University Law Center.** Appellees both **implicitly and explicitly** required Appellant to complete her degree in a less invidiously racist forum - and outside of the state of Missouri.

Appellees, from December 2022 to present, have continuously initiated contact with the state of Maryland to punish Appellant for her complaints of race and sex discrimination including but not limited to: 1) sending Appellant a formal reprimand for complaining of race discrimination in the state of Maryland 2) filing collections actions in the state of Maryland 3) interferring with performance of her clerkships in the state of Maryland, 4) attempting to bind Appellant and her family members (all of whom are Maryland residents) to a non-disparagement agreement and release of all claims, and 5) lying to the Maryland State Board of Law Examiners about Appellant's character such that Appellant constituted a threat to Defendant University.

## SUMMARY OF FACTUAL ERRORS AND OMISSIONS

Appellees' motion to dismiss was granted erroneously because their arguments - through their filings with this court, and those of the record in the District Court of Maryland - rely on material omissions of key facts that are outcome determinative in Appellant's case.

Neither Appellees, nor the District Court, has acknowledged the fact that Appellees intentionally and foreseeably interfered with Appellant's internships to be performed in the state of Maryland (as they all had in person and remote responsibilities) at the National Center for Youth Law, the District of Columbia's Office of Human Rights, or the United Nations Permanent Forum for People of African Descent - three clerkships that were, until the interference and prohibition by Appellees in January 2023, to be performed in the state of Maryland.

The District Court and Appellees have also failed to acknowledge the following dispositive facts: 1) Appellant was never fired from Appellee University,[2] 2) Appellant never resigned from Appellee University, 3) Appellant reported her research income from Appellee University under Appellee Davis to Maryland, 4) Appellee unilaterally revoked Maryland resident Appellant 's

---

[2] Appellees revoked Plaintiff's access to her WashU LexisNexis account in July 2025. (Plaintiff's Notice of Intent to File a Reply - ECF 64)

scholarship due to her complaints of race and sex discrimination, causing Appellant harm in Maryland, 5) Appellees are currently instituting collection actions against Appellant, a Maryland resident 6) Appellees brokered a release of all claims and non-disparagement agreement that was intended to bind Appellant and her family members (who are all Maryland residents), 7) Appellees' private police force use of "unconstitutional wanteds"[3] (and the 8th Circuit's unequivocal support of the same) against students who protest or complain of race and sex discrimination forced Plaintiff back into the state of Maryland for her safety and 8) the 8th Circuit has enabled and condoned Appellees' conduct through its

---

[3] The "wanteds" system enables any Missouri officer to arrest and detain persons listed as "wanted" without going to a judge, providing probable cause or obtaining an arrest warrant. The "wanted" is not listed in any public database. This system was challenged in 2016 by the Center for Constitutional Rights. In 2022, the 8th Circuit ruled that while the use of a wanted is fraught with the risk of violating the Constitution, the policy itself is not unconstitutional. This use of "wanteds" by WashU's private police force is even more invidious than the use by regular police departments because WashU's refusal to provide details surrounding its use of wanted under the Sunshine Law. WashU argues they are not subject to the Sunshine Law since WashU police department officers are private employees. Thus, a person has no way of knowing whether WashU issued a "wanted" upon an individual. This instills fear of arrest, detention, and questioning without probable cause, and there is no recourse. This practice is now being challenged by a civil rights law firm in Missouri, alleging that WashU's use of "wanteds" violates the 4th Amendment. Appendix D "St. Louis resident sues WashU and Eureka police for use of 'wanteds' after 2024 protest," St Louis Public Radio by Lacretia Wimbley, September 18, 2025.

application of Missouri's educational malpractice doctrine to extinguish otherwise valid civil rights claims.

Conveniently, Appellees have also failed to acknowledge or dispute that they have their own private police force that routinely and regularly subjects students who protest or complain of race and sex discrimination to "unconstitutional wanteds." (Appendix D.)

Thus, the District Court's decision to grant Appellees' motion to dismiss without prejudice for lack of personal jurisdiction was due to factual error, and material omissions of Appellant's facts. Appellant respectfully requests this Court reverse the District Court's ruling on the motion to dismiss and find that Maryland has personal jurisdiction over Appellees so that Appellant, a Maryland resident, may bring her claims safely in the Federal District Court of Maryland in Greenbelt.

**SUMMARY OF ARGUMENT**

Defendants purposefully availed themselves of the privilege of conducting activities in Maryland, because all of Plaintiff's claims arise from Maryland-directed activities, and exercising jurisdiction would be constitutionally reasonable. Appellees have four attorneys, two law firms, and a private police force (note: the

12

only private police force for an institution in the state of Missouri) at their disposal. Appellant is a pro se, single Black woman on Maryland food stamps.

Appellees' motion to dismiss was granted erroneously because their arguments  - through their filings with this court, and those of the record in the District Court of Maryland - rely on material omissions of key facts that are outcome determinative in Appellant's case.

The facts do not support Defendants' nonsensical idea that Plaintiff's claims occurred entirely at Washington University's Missouri campus. Appellees' are attempting to collect a debt on Plaintiff in the state of Maryland at this moment. (Appendix A) Further, there was nothing unilateral about Appellant's relocation to Maryland after her suspension; Appellees ordered her to leave, forbade her from seeing a movie with other University students at an off-campus AMC movie theater, and constructively evicted Plaintiff from her apartment by telling her that she would be arrested if she were found in violation of the **indefinite, and undefined terms of suspension.** Further, Appellees have a practice of unlawfully detaining people who are Black and hold beliefs synonymous with racial equality. (Appendix D) Appellees demanded that Appellant finish her degree at a different university. Appellees also ordered Appellant to attend classes remotely, and sent all correspondence regarding their directive to Plaintiff in Maryland. Therefore,

13

Appellant has demonstrated minimum contacts required to satisfy personal jurisdiction over Appellees in Maryland.

The district court did not properly exercise its discretion in denying Appellant's request for jurisdictional discovery. Appellant delineated the specific evidence she would seek through jurisdictional discovery and explained how such evidence might establish personal jurisdiction, and met her burden to demonstrate a need for jurisdictional discovery under *Grayson v. Anderson*, 816 F.3d 262, 266 (Mar 7, 2016) (parties fully performed jurisdictional discovery with depositions, affidavits, and interrogatories). In contrast, no jurisdictional discovery was granted by the District Court in this action. Appellant asserts that the District Court abused its discretion in denying her request. Thus, the District Court's judgment should be reversed in all respects.

I.  **The District Court and Defendants Err in Ignoring *Ford v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021) ("Ford")**

In *Ford*, the Supreme Court gave lower courts an extensive footprint to follow in determining personal jurisdiction. Yet, both the District Court's Memorandum of Opinion and the Informal Appellees' Brief barely mention it.

As Supreme Court Justice Gorsuch wrote for the 8-0 opinion, "Lower court judges may sometimes disagree with this Court's decision, but they are never free

14

to defy them."  Appellant respectfully requests that the 4th Circuit apply the Supreme Court's finding in *Ford* to the facts of this case and find that Maryland has personal jurisdiction over the Appellees. "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutton v. Davis*, 454 U. S. 370, 375 (1982) (per curiam).

Additionally, as stated in Appellant's Informal Brief, the Supreme Court found in *Ford* that a plaintiff injured by a malfunctioning Ford car could sue in a plaintiff's resident state even though the Appellee, Ford, had not designed, manufactured, or sold the particular car in the Plaintiff's resident state. Thus, the plaintiff in *Ford* had personal jurisdiction over Appellee Ford, even though the plaintiff's claims did not "arise from" Appellee Ford's contacts in plaintiff's resident state so long as they were "related to" Appellee Ford's contacts in plaintiff's resident state.

Again, a car is a car. The fact that a car is a car, and research is research, directly contradicts Appellees' statements that "Plaintiff's claim did not arise out of or relate to WashU's Maryland contacts related to research funding and dual degree programs," "WashU's general activities relating to contracts with Maryland universities or federal government agencies . . . Brown's claims do not arise from

15

these contacts . . ., " and "Thus, WashU's engagement with the National Institutes of Health ("NIH") is not relevant to the analysis." (Appellee's Brief at 33, 34) Both the District Court and Appellees fail to acknowledge the fact that Appellant was hired to perform research under Appellee Davis to discount the relevance of other Maryland entities' research contracts with WashU to Appellant's claim of personal jurisdiction. This is a clear factual error.

Further, *Ford* also asserted superficial differences between the plaintiff's car and the cars sold by car dealers in the state in arguing that the plaintiff's resident state did not have jurisdiction. The Supreme Court rejected Ford's arguments unanimously. If the Appellees' and the District Court had followed *Ford* and acknowledged Appellant's research under Appellee Davis, they would have come to the inescapable conclusion that WashU research contracts with other Maryland entities are "related to" WashU's research contract with Plaintiff and therefore, support a finding of personal jurisdiction in Maryland.

Accordingly, Appellant respectfully requests that the 4th Circuit follow the *Ford* Supreme Court precedent and find that WashU's research contracts with other entities are "related to" Appellant's research for WashU under Appellee Davis and support a finding of personal jurisdiction over Appellees in Maryland. Again,

16

Appellant had a research contract working under Appellee Davis and was employed by WashU. (Appellant's Informal Brief at 15.) **Research is research.**

## II.    The District Court and Appellees Erred in Finding that Appellees' Solicitation of NIH Did Not Relate to Appellant's Claims

Appellant alleged that Appellee "The Washington University" has extensive research contracts with Maryland entities including but not limited to NIH, NASA, Johns Hopkins, and at least 4 dual degree programs with Maryland entities. Appellant also quoted a WashU Dean, Pearlmutter, who is openly soliciting funds from NIH.  (Appellant's Informal Brief at 18.)  Thus, Appellant respectfully requests that the 4th Circuit find that Appellant did allege that WashU solicited business and engaged in significant long-term business activities in Maryland and that the District erred in not finding the same.

## III.  The District Court and Appellees' Erred in Not Considering Appellant's Extensive In-Person Contacts Because They Were Not in Maryland

Appellees cite old and outdated 4th Circuit case law, *Consulting Eng'rs Corp v. Geometric Ltd.*, 561 F. 3d 273, 278 (4th Cir. 2009), containing the "in the forum state" language and mischaracterize Appellees' recognition of NEWER 4th Circuit case law, *UMG Recordings, Inc. v. Kurbanov*, 963 F. 3d 344 (4th Circuit 2020), by omitting the "in the forum state" language as "bordering on the frivolous." (Appellees' Informal Brief at 35.)

17

Appellant respectfully responds that the Supreme Court has stated that a court can overrule its own precedent if it finds a special justification or if the prior ruling is unworkable or badly reasoned, a practice known as horizontal *stare decisis*. For example, the Supreme Court has stated "Our precedent is to be respected unless the most convincing of reasons demonstrates that adherence to it puts us on a course that is clear error." Additionally, beyond workability, the relevant factors in deciding whether to adhere to the principle of *stare decisis* include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned." *Citizens United v. FEC*, 558 U.S. 310, (2010) citing *Montejo* v. *Louisiana*, 556 U. S. ___, ___ (2009) (slip op., at 13) (overruling *Michigan* v. *Jackson*, 475 U. S. 625 (1986)). We have also examined whether "experience has pointed up the precedent's shortcomings." *Pearson* v. *Callahan*, 555 U. S. ___, ___ (2009) (slip op., at 8) (overruling *Saucier* v. *Katz*, 533 U. S. 194 (2001)).

In *UMG Records, Inc.*, 963 F. 3d 344 (4th Circuit 2020), the 4th Circuit listed the 6th factor in determining purposeful availment as "whether the defendant made in-person contact with a resident of the State regarding the business relationship." *Id*. This case was decided more than a decade after *Consulting Eng'rs Corp v. Geometric Ltd.*, 561 F. 3d 273, (4th Cir. 2009). In *UMG Records, Inc.*, the 4th

18

Circuit reversed a Virginia court's dismissal for lack of personal jurisdiction over a Russian website owner who allegedly pirated music illegally through his "stream-ripping" service.

The Russian website owner in *UMG Records, Inc.* had never entered Virginia or even the United States and operated his websites entirely from Russia. He had no employees, real estate, bank account or taxes in the United States and claimed that it would be extremely burdensome for him to travel to Virginia or anywhere in the United States for trial and other proceedings. Yet, the 4th Circuit found personal jurisdiction based on the Russian website owner's advertising practices, which purposefully availed the Russian website owner to personal jurisdiction in Virginia. Similarly, Appellant respectfully requests that the 4th Circuit find personal jurisdiction over Appellees in Maryland through Appellees' research contracts with Appellant and other Maryland entities, solicitation of contact, and Appellee's intentional discriminatory treatment of Appellant because she complained of race and sex discrimination even though Appellees had limited in-person contact with Appellant. While Appellant was in Maryland, **one such agent of Appellee University, Hilary von Rohr, planned to meet with Appellant while in the Washington D.C. Area** *after* **her scholarship was rescinded.** Further, Appellee Carrie Burns called Appellant's mother in the state of Maryland

19

to inform her that Appellant's scholarship had been revoked. (See <u>Appendix E</u> and

<u>Appendix F</u>)

### IV. The District Court and Appellees Erred in Stating that *Calder*'s Effect Test Requires That Appellees Engage in Tortious Conduct in Maryland

The Fourth Circuit has characterized *Calder* as establishing the "effects test' of specific jurisdiction[.]" *Carefirst*, 334 F.3d at 398 n.7. Under this test, the plaintiff must establish that: "'(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.'" *Consulting Eng'rs*, 561 F.3d at 280 (quoting *Carefirst*, 334 F.3d 14 at 398 n.7).3

After Appellant complained of race and sex discrimination at Appellee University, Appellees intentionally transacted sanctions to Appellant's address in the state of Maryland as to notify her that she was not welcome in the state of Missouri, making the focal point of the harm, the state of Maryland. (<u>Appendix D</u>)

The District Court stated "regardless of whether Maryland was the focal point of the harm, however, Brown has not established that Defendants either engaged in tortious conduct in Maryland or that they expressly aimed their conduct

20

into the state of Maryland, as required to establish personal jurisdiction based on the effects test." (Memorandum Opinion at 26.) But instead of determining whether Maryland was the focal point of the harm caused by Appellees' tortious conduct, the District Court discounted every action Appellees took against Appellant as not satisfying the requirements for jurisdiction because they all took place in Missouri. (Memorandum Opinion at 26.)[4] This is a clear factual and legal error. In fact, if the requirement for personal jurisdiction under the Effects Test was that the Defendants actions had to take place in the plaintiff's requested forum in *Calder*, Jones would not have jurisdiction over Calder in California because all of Calder's actions took place in Florida.

Instead, the District Court should have found that Appellees' conduct was intentionally directed at Appellant, a Maryland resident, and jurisdiction over Appellees' was proper on that basis. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident and jurisdiction over them is proper on that basis.") All of Appellees' actions against Appellant were intentional and intended to

---

[4] "Brown's intentional infliction of emotional distress claim is based on the alleged acts, . . . all of which consisted of conduct allegedly taken by Appellees in Missouri. Likewise, the fraud claim is based on . . . none of which occurred in Maryland. Even if the claim of negligence . . . could apply here . . . occurred in Missouri rather than Maryland. . . ." *Id*.

publicly tarnish Appellant's reputation for the rest of her life, as she will have to disclose this suspension for the rest of her life on bar and employment applications.

This is not a case where the Appellant was an unfortunate casualty of Appellees' general activity, analogous to the unfortunate recipient of a boiler that blows up due to a welder's improper construction of the same. (*Id.* at 789 citing "cases which hold that jurisdiction will be proper over the manufacturer . . . should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant State.") **Appellees intentionally impoverished Appellant through their suspension and revocation of scholarship to destroy Appellant and her legal career**; therefore, Appellees' purposeful availment in the state of Maryland is enumerated through Appellant's District Court pleadings.

### A. The District Court Erred in Not Recognizing That Any Efforts by WashU to Collect Tuition From Appellant and Revocation of Appellant's Scholarship Would Subject Them To Maryland Jurisdiction Under *Calder*

The revocation of Plaintiff's scholarship is the proximate and actual cause of Plaintiff's subsequent impoverishment, and Appellees' collection actions in the state of Maryland.

Appellee WashU sent to Appellants' Maryland address statements that

22

Appellant owed WashU over $40,000 and that they were going to send Appellant to collections. What court could WashU use to collect on the debt? What landlords would do credit checks on Appellant's to deny her housing due to the WashU collections? What banks would deny Appellant loans for mortgages, cars, or businesses due to Appellant's collection efforts? Where were the jobs that Appellant would be denied because of WashU's tarnishment of her credit history? The answer to all of these questions contain one word: MARYLAND. That is, Appelleess solicited contact with Maryland courts to effectuate a judgement and collect Appellant's debt through seizure, garnishment, and/or other civil collections methods since Appellant is a Maryland citizen.

All of the cascading effects and tortious impact of Appellees' decisions to attempt to collect upon the debt they created in Appellant occurred in Maryland as well. Maryland landlords pull Appellant's credit report and deny her housing due to the WashU debt collections practice against Appellant. Maryland banks deny Appellant credit to buy a house, car, or business. Maryland businesses would, and are, denying Appellant jobs because of the WashU debt. Thus, Maryland is the jurisdiction most impacted by Appellees' collection actions. Missouri would not be impacted at all as Appellant has less than zero interest in obtaining or applying for housing, cars, businesses, or jobs in Missouri.

23

**B.  The District Court Erred in Not Recognizing That Any Efforts by WashU to Fraudulently Expel Appellant Would Subject Them To Maryland Jurisdiction Under *Calder***

Appellees' alleged that Appellant was a threat to the Appellees' university. There was a simple answer to this alleged threat: allow Appellant to transfer to another university. Yet when Appellant applied to several law schools at the end of her first year to transfer, Appellees (specifically, Appellee Walsh) refused to send a timely Letter of Good Standing to support Appellant's application. Appellant received multiple inquiries from Georgetown and Columbia regarding the need for a letter of good standing from WashU to support her application.  Appellant's mother even called Appellee Walsh, asking her to send the letter of good standing to Georgetown and Columbia.  If Appellee really thought Appellant was a threat to WashU, why didn't they send the letter of good standing and get rid of her?

Appellant respectfully submits that Appellees' wanted to destroy Appellant's reputation, and allowing Appellant to transfer to another university would prevent Appellees from achieving that goal. So instead of providing a timely letter of good standing, they ensured that Appellant would not be accepted to another university and would have to spend another year at WashU. Another year in which Appellees Walsh, Osgood, and Davis conspired to get Appellant expelled as a threat to WashU in retaliation for Appellant complaining of race and sex discrimination.

24

This includes Appellee Davis's racist chicanery, the racist and sexist Student Conduct Board hearing, Appellee Burns's scholarship revocation, and the Maryland billing/collections. Appellees' intentional actions against Appellant must subject Appellees to personal jurisdiction in Maryland under *Calder*.

**V. The District Court Erred in Finding that Appellant's Move to Missouri was Unilateral, that Appellant's Suspension Was Limited to Appellees' Campus Only, and that the Vast Majority of the Appellees /WashU Conduct Underlying Brown's Claims Occurred in Missouri and Not Maryland**

Appellant respectfully requests that the 4th Circuit review Appellant's Informal Brief Section V as supporting Appellants' argument that the District Court and Appellees' Erred in Characterizing Appellants' Move to Maryland as unilateral. (Appellant's Informal Brief at 17 – 24.)

This section discusses two portions of the Release of All Claims and Non-Disparagement Agreement that show that Appellants' move to Maryland was not unilateral.  Although this was submitted to the District Court, the District Court does not cite the Release of All Claims and Non-Disparagement Agreement at all. Appellees do not address the Release of All Claims and Non-Disparagement Agreement in their Informal Appellees' Brief.  This is clear factual error.

Again, Appellant does not know why the District Court did not address Appellees' Release of All Claims and Non-Disparagement Agreement. Appellees'

25

Release of All Claims and Non-Disparagement Agreement clearly show that Appellant's move to Maryland was not unilateral. Thus, the only way Appellees overcome the factual conclusion that Appellant's move to Maryland was not unilateral is to completely ignore Appellee's threat of arrest against Appellant, and Appellee's Release of All Claims and Non-Disparagement Agreement - **all in the hope that the Courts never acknowledge it either.**

The Release of all Claims and Non-Disparagement Agreement is a pivotal example of Appellee reaching into the state of Maryland to utilize Maryland's state instrumentalities, including the courts, to silence Appellant and her Maryland family members.

## VI. The District Court Did Find that Appellant Pleaded Sufficient Facts to Show Evidence of a Conspiracy

The District Court stated in its Memorandum Opinion that it found evidence of a conspiracy. (Mem. Opinion at 30.) "Even assuming that Brown has pleaded sufficient facts to show that there was some kind of a conspiracy, the vast majority of these identified acts or omissions do not involve contacts with Maryland, and to the extent that some involve or arguably involve such contacts, the Court has already concluded that they do not demonstrate purposeful availment relating to Brown's claims so as to support personal jurisdiction over Appellees." *See supra* part II.B. 1-4. "Where there is no alleged co-conspirator who is subject to personal

26

jurisdiction based on these contacts, no other appellees can be deemed to be subject to personal jurisdiction under this theory." (Mem. Opinion at 30.)

Appellant respectfully submits that this indicates that the District Court would have found Appellant pleaded sufficient facts to show that there was a conspiracy sufficient to support personal jurisdiction over all of the Appellees if it had found at least one of Appellees subject to personal jurisdiction.  Thus, Appellee respectfully requests that the 4th Circuit find that there are Appellees that are subject to Maryland jurisdiction and apply the 4th Circuit case law regarding co-conspiracy to find all Appellees are subject to personal jurisdiction in Maryland.

**VII. Appellant Respectfully Requests that the language "Under Maryland Long Arm Statute S 6-103(b)(6)"  Be Removed from the title of Section V of her Informal Brief.  It was an Editing Error and Should Have Been Discussed As Relating to Jurisdictional Discovery.**

Appellant, being pro se, erroneously placed the Maryland Long Arm Statute **6-103(b)(6)** in the wrong section. Nevertheless, discovery has not been performed with regards to the matter of insurance policies. It is customary for universities to obtain insurance policies that may indemnify or impact Appellant's claims against some or all of the Appellees. Appellant does not desire, nor intend through her filing, to preclude her ability to collect on the same. Appellees are correct that Section 6-103(b)(6) is not applicable to Section V of Appellant's Informal Brief

27

and respectfully requests that the language be omitted so the title reads "The District Court Erred in Finding that There Were No Allegations That Any Relevant Contract Was Expected to be Performed in Maryland."

## VIII. The District Court Should Have Allowed Jurisdictional Discovery

A court may grant a request for limited discovery related to the issue of jurisdiction if the plaintiff proffers enough evidence to show that additional information will produce the evidence needed to establish jurisdiction. *Carefirst of Md. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 402 (4th Cir. 2003); *ALS Scan v. Digital Serv. Consultants,* 293 F.3d 707, 716 n.3 (4th Cir. 2002).

In July 2021, Appellant received a letter at her Maryland Address from the Office of Student Conduct Board issuing a warning. (Appendix B) There are numerous additional documents and correspondence regarding Plaintiff's constructive eviction, her suspension, and Defendants' conspiracy that have not been entered into evidence because discovery has not commenced. This additional information regarding Plaintiff's forcible relocation to the state of Maryland would support a finding of personal jurisdiction in the state of Maryland over Defendants in the state of Maryland.

Discovery has not commenced, and the most troubling aspects of Plaintiff's complaint are not addressed by Defendants. Plaintiff has alleged that a tenured

28

professor feigned that Plaintiff disrupted her class in order to manufacture a facially legitimate reason to expel Plaintiff from Defendant University in retaliation for complaining of race and sex discrimination. Under *Calder*, these allegations would show Appellees' intentional actions to destroy Plaintiff's job prospects, reputation, and well-being in Maryland and thus subject Appellees to personal jurisdiction in Maryland. Defendant has not addressed this in any of their pleadings. The silence is deafening.

Further, Plaintiff's allegations against Defendants have proffered enough facts to show that additional information will produce the evidence needed to establish jurisdiction, whether under the Maryland Long Arm Statute's conspiracy theory of personal jurisdiction or through comporting with the due process requirement of the 14th Amendment.

The District Court acknowledged Appellant's allegation that WashU has contracts in excess of $1 billion . . . with Maryland universities, entities, and individuals including the National Institutes of Health ("NIH"), the National Aeronautics and Space Administration ("NASA"), Johns Hopkins University ("JHU") and four universities in which it has dual degree programs. (Memorandum Opinion at 13.)

29

Appellant supported this allegation with news articles discussing these research contracts attached as Exhibits to its pleadings. Thus, the District Court was well aware that WashU had huge newsworthy research contracts in Maryland. The district court was also aware of Appellant's $1000 research contract. Thus, it knew that WashU also had at least one non-newsworthy research contract with Maryland entities. Appellant respectfully submits that if the District Court determined that the Appellant evidence regarding Maryland contacts was insufficient to establish jurisdiction, they should have allowed discovery to determine if there were non-newsworthy contracts that established personal jurisdiction instead of summarily concluding that there were no such research contracts and thus, no personal jurisdiction.

## IX. The District Court Should Not Have Allowed Appellees to Escape Accountability By Transferring this Case to the United States District Court for the Eastern District of Missouri, part of the 8th Circuit

Appellees *gleefully* delineated to the District Court how Missouri courts have allowed universities to escape liability for race and sex discrimination due to the very high bar set to find actionable behavior under the educational malpractice doctrine. This doctrine states that "Generally, courts have refrained from recognizing educational malpractice claims, whether in tort or contract, on the premise that universities must be allowed the flexibility to manage themselves and

30

correct their own mistakes." ("Def. Memo. Supp. Mot. to Dismiss" ECF 33-1) p. 23 citing *Lucero v. Curators of Univ. of Mo*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) and *Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.2d.3d 696, 700 (Mo. Ct. App. 2008) ("Courts have refused to become the overseers of both the day-to-day operation of the educational process as well as the formulation of its governing policies.")

Furthermore, regarding Appellant's Intentional Infliction of Emotional Distress Claim, Appellees stated "In Missouri, it is a rare occurrence when a defendant's conduct is sufficiently extreme and outrageous to warrant recovery" Def. Memo. Supp. Mot. to Dismiss ECF 33-1 p. 24 citing *Gillis v. Principia Corp.*, 832 F.2d 865, 875 (8th Cir. 2016).  Appellees then expound upon all of the deplorable actions of a college professor against a student that the Eastern District of Missouri found were "well short of a level of extremity that could be said to exceed all possible bounds of decency and be regarded as atrocious and utterly intolerable." *Id*. citing *Gillis v. Principia Corp.*, 111 F. Supp. 3d 978, 987 (E.D. Mo. 2015)  Regarding Appellants' negligence claim, Appellees' state that "a duty to protect against the criminal acts of third parties is generally not recognized" and that "no special relations exist between a college and its own students because a

college is not an insurer of the safety of its students." *Id*. citing *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003).

Appellant respectfully submits that Appellees wants to be in the 8th Circuit not because Maryland is inconvenient (e.g. their multi-billion dollar endowment) - but because the 8th Circuit case law is highly favorable to Appellees and Appellees are highly unlikely to be held responsible for any of its deplorable behaviour against Appellant because she complained of race and sex discrimination.

Furthermore, as stated previously, **WASHU HAS ITS OWN PRIVATE POLICE FORCE** that routinely and regularly subjects students who protest or complain of race and sex discrimination to "unconstitutional wanteds." Again, the 8th Circuit has allowed the use of these "wanteds" and Appellant has no recourse if WASHU uses the same against her in the 8th District. (See Footnote 3, page 10)

**X. The Case Law Regarding Personal Jurisidction in Existence is Inadequate to Address Appellant's Civil Rights Claims, the History and Reality of Racial and Sexual Violence, Fear and Retaliation Regarding Personal Jurisdiction**

It is critical that the 4th Circuit not lose sight of the real controversy, or the origins of this suit. Appellee is a billion dollar university asking the 4th Circuit to maintain the District Court's erroneous, dismissal against Appellant, a Black female alumni of Appellee University, as **Appellees now seek repayment of the**

32

**scholarship that they unilaterally revoked against Appellant after they constructively evicted Appellant for complaining of race and sex discrimination in connection with her education and employment.**

Appellees' cruelty knows no end. Appellees intentionally and foreseeably impoverished Appellant in the state of Maryland through the unilateral revocation of her scholarship *after* she had moved to Maryland and matriculated at Georgetown University for her final year of law school. In response, Appellant filed this action. Appellees are now are attempting to collect a debt on a Maryland citizen, and want the 4th Circuit Court of Appeals to dismiss this action so that Appellant will have no choice but to pay back the scholarship that Appellees stole, while Appellees initiate collections actions against Appellant in the state of Maryland.

Appellees aren't any more foreign to the forum of Maryland, than the Russian defendant in *UMG Records, Inc*. Defendants in *Calder*, *Ford*, and *UMG Records, Inc.* - three cases where the Defendants actions constituted purposeful availment, and Defendants were able to be hauled into the forum state over their objection.

Over the past four years, Defendants have solicited continuous contact with Appellant in the state of Maryland. The only address that Defendants had on file

33

for Appellant while they instituted collections actions was her address in the state of Maryland. How did Defendants plan to collect - if using her Maryland address to locate her, using the Maryland police to seize her car (which is registered in the state of Maryland), the instrumentalities and Courts of the State of Maryland to effectuate the takings of Appellant's property? Appellees were not going to be able to seize Appellant's property and contact Appellant anywhere else.

Appellees have made a myriad of retaliatory and discriminatory actions in the state of Maryland, directed towards Appellant in the state of Maryland, to collect the debt that arose from Appellees unilateral revocation of Appellant's scholarship from August 2021 to the present.

## CONCLUSION

Defendants, as true parishioners of the land of Dred Scott and Michael Brown have significant influence over Missouri courts and have exhibited less than zero regard for Plaintiff's civil rights through their aforementioned conspiracy. (Am. Comp.     126-179) Contrary to Defendants' assertion that "all the alleged wrongs occurred in Missouri", the Individual Defendants participated in zoom conferences, hearings, and electronic activities continuously aimed at Plaintiff, the forum state of Maryland through the SCBH, and their tortious conduct interfering

34

with her employment, clerkships, and revoking her scholarship as Appellees continued to harass and impoverish Plaintiff in Maryland. (Am. Compl. ¶¶ 7-16.) None of Appellees' actions were possible without their solicitation of Appellant's response and participation in the state of Maryland. Therefore, Plaintiff respectfully requests a reversal of the District Court's ruling.

**STATEMENT REGARDING COUNSEL REQUEST**

Plaintiff is pro se, indigent, and respectfully requests counsel in this proceeding. (Appendix G)

**Signature of Pro-Se Plaintiff/Appellant**

Allison Brown
6405 Chew Road
Upper Marlboro, MD 20772
E-mail: asb151@georgetown.edu

# CERTIFICATION OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,512 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced 14-point Times New Roman font using Microsoft Word.

# APPENDIX - TABLE OF CONTENTS

Appendix A - Current WashU Ledger as of September 25, 2025 asking Plaintiff, in the state of Maryland, to remit payment to Washington University's P.O Box in Illinois

Appendix B - Sanction and Warning from Washington University in St. Louis to Plaintiff in State of Maryland

Appendix C - Brown Editing Affidavit

Appendix D - Article about WashU's unconstitutional use of wanteds

Appendix E - Hilary von Rohr, Agent of Appellee University Solicited In Person Contact with Appellant

Appendix F - Appellee Carrie Burns Soliciting Contact with Plaintiff's Mother

Appendix G - Counsel Request Pursuant to Article

## Appendix A



Brown, Allison S (503456)
2000 Flourmill Court
Crownsville, MD 21032
United States of America

Remit payment to:
Washington University
P.O. Box 7412009
Chicago, IL 60674-2009

| | | | |
|---|---|---|---|
| Student ID | 503456 | Fall 2025 Date Range | (08/25/2025-12/17/2025) |
| Academic Period | Fall 2025 | Total Due for: Fall 2025 | $ 40,294.00 |
| Academic Level | | **Due Now for All Academic Periods** | **$ 40,294.00** |

*For details of amounts due for other academic periods, run the statement for that academic period.*

## Charges

| Date | Charge | Due Date | Amount |
|---|---|---|---|
| Aug 11, 2025 | Converted Outstanding Balance | Sep 11, 2025 | $ 40,294.00 |

## Courses

| Course | Units | Unit Type |
|---|---|---|

Make check payable to Washington University.
Visit https://financialservices.wustl.edu/student-accounts for other payment options and questions.
Student.Accounting@wustl.edu or call 314-935-5274

Contacts:
Grad Arts & Sciences: GraduateArtSci@wustl.edu
Continuing and Professional Studies: capsfinancialaid@wustl.edu
DBBS: DBBS-StudentFinance@wustl.edu
Medical School: wusmregistrar@wustl.edu
Student Financial Services: Financial@wustl.edu

## Appendix B

Evidence 24

 Student Conduct and
Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

**PERSONAL AND CONFIDENTIAL**
VIA E-MAIL:allison.brown@email.wustl.edu

June 27, 2022

Allison S Brown
2000 Flourmill Court
Crownsville, Maryland 21032

RE: Case #00066-001-2022

Dear Allison:

Thank you for meeting with me on June 3, 2022. I completed my investigation into this matter and am writing to inform you of my decision in the case filed against you under the University Student Conduct Code. You were charged with the following violations of the Student Conduct Code:

*University Student Conduct Code/20. Violating rule/ policy/ regulation - Knowingly or recklessly violating a published University policy, rule, or regulation; or participating in conduct which one should reasonably know to be a violation of a published University policy, rule, or regulation.*

On April 6th, 2022 you posted a screenshot of another student's Canvas class submission to an Instagram account which is a violation of the Law School Recording Privacy Policy that you received a copy of on January 21, 2022 from Dean Elizabeth Walsh. The policy states, "*Students using Zoom or alternative platforms should not capture screen shots of a class session or otherwise capture the content of any class session (video and/or audio) such as through the use of a phone camera or recording app.*"

As a result of our meeting, I am finding you responsible for violating the following Student Conduct Code(s):

**University Student Conduct Code/20. Violating rule/ policy/ regulation - Knowingly or recklessly violating a published University policy, rule, or regulation; or participating in conduct which one should reasonably know to be a violation of a published University policy, rule, or regulation.**

Based upon this meeting and the information you provided, I am imposing the following sanctions:

*Warning (1)*
*Any continuation or repetition of said offense or any other Code violation during your enrollment at Washington University may result in more severe sanctions. The matters may be referred to the University Student Conduct Board for a hearing.*

Allison, you are a valued member of the Washington University community and I want to see you be successful during your remaining tenure here as a student. All of the above obligations are to assist you in successfully completing your time at Washington University. If there is anything that I can do to further assist you along the way, please feel free to reach out to me personally using the information below.

39

**Appendix C**

## IN THE UNITED STATES
## COURT OF APPEALS FOR THE FOURTH CIRCUIT

Allison Brown v. Washington University - Case No. 25-1887

**AFFIDAVIT OF BROWN EDITING LLC - SOLE PROPRIETORSHIP**

1. My name is Allison Brown. I am the sole proprietor of Brown Editing LLC. I am over twenty-one years of age and a Maryland resident. I have personal knowledge of the following statements made below in support of Plaintiff's Reply to Defendant's Supplemental Brief in Support of Their Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative Failure to State a Claim, and I am fully competent to provide testimony about the same.

2. Brown Editing is a Maryland entity (Department ID Number: W21437553) that was formed and registered with the Maryland Secretary of State as a "Domestic LLC" on February 16th, 2021.

3. Brown Editing's principal office is located at 2000 Flourmill Court, Crownsville, MD 21032 and the Resident Agent is Allison Brown, listed at the same principal office address.

4. Brown Editing provides low-cost, high-quality editing services of resumes, cover letters, college applications, and graduate school applications to customers across the United States.

5. Brown Editing is an editing and proofreading firm that has been the recipient of the "Emerging Changemaker Award" from the Olin Business School at Washington University in St. Louis.

6. Defendants have thoroughly interfered with the business processes of this firm through repeatedly traumatizing Allison Brown and interfering with her business by instituting a campaign of retaliation against her for complaining of race and sex discrimination.

7. Brown Editing, LLC, a Maryland entity, has suffered immensely - financially and from an operational perspective - as a result of Defendants' harm to Allison Brown's (the sole proprietor) and Allison Brown's reputation.

8. Brown Editing has suffered from a decrease in social media content production, and effectiveness in customer service and retention as a result of Defendants' enduring harm of Allison Brown over the past four years, and the revocation of Allison Brown's scholarship at Defendant University.

9. Brown Editing LLC, a Maryland entity, has a vested interest in the litigation of Allison Brown's claims in the state of Maryland to repair the harm caused to Brown Editing LLC by Defendants and their agents in the state of Maryland.

10. I, as Allison Brown, and sole proprietor, moved to Maryland and have not returned to Missouri since at the very latest December 2022.

11. The health and wellbeing of Brown Editing LLC as a company is at risk due Defendants actions towards Allison Brown. Further, Allison Brown's personal safety would be at risk if has to litigate her claims before the federal district court in St. Louis, Missouri in light of the irrational and discriminatory actions WASHU has taken against Plaintiff.

12. I think about the racial and sexual discrimination committed by Defendants, the Defendants' unwillingness to recognize any wrongdoing against Plaintiff, and Plaintiff's struggles as a result of Defendants actions every single day.

13. Please do not extinguish Plaintiff's rights by prematurely dismissing her claims for lack of personal jurisdiction or failure to state a claim. I wholeheartedly believe that after discovery, there will be more than ample evidence that my claims are valid and that this Court has personal jurisdiction over the same.

41

14. I certify, not merely that I believe that my attached signature is valid, but that as to my personal knowledge in every particular fact or allegation, it is original and does not depend on information or hearsay.

15. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts therein and Exhibits attached are true and correct.

Executed on September 26, 2025

Allison Brown
6405 Chew Road
Upper Marlboro, MD 20772
E-mail: asb151@georgetown.edu

42

**Appendix D**



s|t|l|p|r   n|p|r

# St. Louis resident sues WashU and Eurek police for use of 'wanteds' after 2024 protest

St. Louis Public Radio | By **Lacretia Wimbley**

Published Sept. 18, 2025 at 12:38 p.m. CDT

**LISTEN · 28:05**

*ArchCity Defenders*

43

Kaitlyn Killgo, 36, of St. Louis is suing WashU and the Eureka Police Department, alleging that their use of "wanteds" is unconstitutional.

St. Louis resident Kaitlyn Killgo is suing a detective from the Washington University Police Department and an officer from the Eureka Police Department for detaining her on a "wanted" last year due to allegations that an officer's riot helmet was stolen during a protest in April 2024.

The case was filed by civil rights law firm ArchCity Defenders in federal court on Thursday. The suit argues that police use of "wanteds" against Killgo, 36, has caused her fear and anxiety — particularly since police stated they will not remove her from the wanteds system after she refused to answer questions.

Washington University and St. Louis County are also listed as defendants as Killgo seeks punitive damages in the lawsuit.

The wanteds system enables any officer in Missouri to arrest and detain persons of interest wanted for questioning, even if the arresting officer has no knowledge about the alleged underlying offense. Police can find the names of individuals wanted for questioning in a centralized system for law enforcement called the Regional Justice Information System.

**Listen to Kaitlyn Killgo and Maureen Hanlon discuss this story on 'St. Louis on the Air'**

LISTEN · 28:05

Police can arrest and detain those listed as "wanted" without going to a judge, providing probable cause or getting an arrest warrant.

But the use of wanteds by police has been challenged in court for nearly a decade — a lawsuit filed in 2016 by the Center for Constitutional Rights and ArchCity Defenders states that plaintiffs' Fourth Amendment rights were violated after they were targeted with a "wanted."

The Court of Appeals for the Eighth Circuit issued a ruling on that lawsuit in November 2022, writing that while St. Louis County's use of wanteds is "fraught with the risk of violating the

44

Constitution," the policy itself is not unconstitutional.

Killgo said she hopes her lawsuit will bring about change.

"These wanteds have to go away," Killgo said in a statement. "It's immoral. It's illegal. But more importantly, it's inhumane. I feel like I've been kidnapped by the police. And kidnapping is illegal, but I have no way, other than this lawsuit, to get my rights back."

## The arrests

Killgo was arrested by the Washington University police in April 2024 while attending a divestment and anti-genocide protest on campus. She was detained at the St. Louis County jail and released later that night.

Four months later, in August, the lawsuit states, Killgo was participating in another protest outside the county jail. At that time, an unmarked black Suburban pulled up near Killgo, and two men inside the car shouted "Killgo!" and "We want our helmet back!"

The following month, during Labor Day weekend, Killgo was arrested and detained on a wanted by officer Torre Kuelker of the Eureka Police Department, who is listed as a defendant in the lawsuit. Killgo and a friend had taken a day trip to a nature reserve when they were pulled over.

Killgo was held at the Eureka Police Department for four hours and would not answer questions while seeking legal counsel. She ultimately retained ArchCity Defenders to investigate the circumstances of her arrest.

## Wanted or not?

ArchCity Defenders attorney Maureen Hanlon and Killgo learned on Sept. 9, 2024, that a police riot helmet had been allegedly stolen during the April protest on WashU's campus after contacting WUPD detectives Jeffrey Barnhouse and Marc Wasem. Barnhouse is listed as a defendant in the lawsuit.

The wanted had been put out by WashU's private police department in April 2024 following the protest, the lawsuit states.

Hanlon told detectives that Killgo would not be adhering to their request for questioning and that Killgo had no knowledge of the riot helmet theft and was not involved.

45

Constitution," the policy itself is not unconstitutional.

Killgo said she hopes her lawsuit will bring about change.

"These wanteds have to go away," Killgo said in a statement. "It's immoral. It's illegal. But more importantly, it's inhumane. I feel like I've been kidnapped by the police. And kidnapping is illegal, but I have no way, other than this lawsuit, to get my rights back."

## The arrests

Killgo was arrested by the Washington University police in April 2024 while attending a divestment and anti-genocide protest on campus. She was detained at the St. Louis County jail and released later that night.

Four months later, in August, the lawsuit states, Killgo was participating in another protest outside the county jail. At that time, an unmarked black Suburban pulled up near Killgo, and two men inside the car shouted "Killgo!" and "We want our helmet back!"

The following month, during Labor Day weekend, Killgo was arrested and detained on a wanted by officer Torre Kuelker of the Eureka Police Department, who is listed as a defendant in the lawsuit. Killgo and a friend had taken a day trip to a nature reserve when they were pulled over.

Killgo was held at the Eureka Police Department for four hours and would not answer questions while seeking legal counsel. She ultimately retained ArchCity Defenders to investigate the circumstances of her arrest.

## Wanted or not?

ArchCity Defenders attorney Maureen Hanlon and Killgo learned on Sept. 9, 2024, that a police riot helmet had been allegedly stolen during the April protest on WashU's campus after contacting WUPD detectives Jeffrey Barnhouse and Marc Wasem. Barnhouse is listed as a defendant in the lawsuit.

The wanted had been put out by WashU's private police department in April 2024 following the protest, the lawsuit states.

Hanlon told detectives that Killgo would not be adhering to their request for questioning and that Killgo had no knowledge of the riot helmet theft and was not involved.

46

Barnhouse's response was that if Killgo "wasn't going to come in [he] would put out the wanted again," the lawsuit states, and that Killgo was required to sign a document stating she was refusing to be questioned.

According to ArchCity Defenders, as of Thursday, it's still unclear if there is an active wanted out for Killgo's arrest since there is no publicly available way for her or any other citizen to know if a wanted has been issued.

ArchCity Defenders attorney Ebony McKeever said in a statement that the organization believes this is a violation of the Fourth Amendment.

"Wanteds are also distinct from warrants because they cannot be searched for in any public database," McKeever said. "This results in people being afraid they'll be arrested, detained, and questioned without probable cause — and there is no recourse."

Attorneys say efforts to obtain details about Killgo's arrest — as well as WUPD policies and procedures that authorized the arrest — have been denied through a Sunshine Request.

The lawsuit states that WashU's reason for the denial is that the university is not subject to the Sunshine Law since WUPD officers are private employees.

According to the lawsuit, WashU is the only private university in the state that has its own police department distinct from the police department of the county in which it is located.

The lawsuit states that Killgo has suffered emotional distress, fear and anxiety due to the threatened arrest and not knowing the status of the wanted.

"She has avoided going out to social events or other opportunities because of her fear of being arrested by law enforcement agencies," the lawsuit reads.

*Send questions and comments about this story to feedback@stlpublicradio.org.*

*Got a news tip? Send it to Lacretia Wimbley.*



**Tags**  | Law & Order | St. Louis County Police Department | Warrants |

| Washington University | ArchCity Defenders | Lawsuit | Eureka |

| St. Louis County | Top Stories |

## Appendix E - Hilary von Rohr, Agent of Appellee University Solicited In Person Contact with Appellant

**From:** Brown, Allison <allison.brown@wustl.edu>
**Date:** Monday, September 4, 2023 at 11:53 AM
**To:** Von Rohr, Hilary <hvonrohr@wustl.edu>
**Subject:** Re: Ethics Video Assignment

Hi Hilary,

Thank you. I have watched the video. Please let me know what time you are available this week for a zoom call. Also, thank you so much for the meeting invitation. I will be looking out for when you come to the DC area.

Thanks much and best,
Allison

--

Allison S. Brown | she/her/hers
Ford School of Public Policy, University of Michigan
Vice President, Black Graduate Students Association
J.D. Candidate, Class of 2024
Washington University in St. Louis School of Law
allison.brown@wustl.edu | albsure@umich.edu
https://www.linkedin.com/in/allisonsbrown/

**From:** Von Rohr, Hilary <hvonrohr@wustl.edu>
**Date:** Thursday, August 31, 2023 at 11:15 AM
**To:** Brown, Allison <allison.brown@wustl.edu>
**Subject:** Ethics Video Assignment

Dear Allison,

Here is the link to the ethics video. Please watch it before you start your projects with Professor Hansford. There is a questionnaire to fill out on Canvas (that I will publish today).

Law Clinic and Externship: Ethics & Professionalism Overview - Washington University in St Louis (kaltura.com)

Let's touch base next week about our weekly zoom meetings. I will also keep you posted about my possible visit to DC this semester. When I visit, I take my DC students to dinner if they are available.

Best,
Hilary

48

## Appendix F - Correspondence with Appellee Carrie Burns

**From:** Brown, Allison <allison.brown@wustl.edu>
**Sent:** Tuesday, August 15, 2023 4:59 PM
**To:** Burns, Carrie <cjburns@wustl.edu>
**Cc:** Patricia Brown <brownandrussell@verizon.net>; Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>; lawfinaid@georgetown.edu
**Subject:** Re: Tuition Agreement - Wash U Law and Georgetown Law

All,

Also, it does not appear anywhere in this consortium agreement that Georgetown University will not accept my $37,000 scholarship. There is simply a statement that the "Host School will not provide this student any financial assistance." Thus, Washington University in St Louis has unilaterally decided not to renew my scholarship despite my good standing. This appears to be in conflict with my scholarship offer letter (please see attached) which was offered on July 27th, 2023 as long as I maintain full-time status.

Please confirm this is the case.

Allison Brown

---

**Date:** Tuesday, August 15, 2023 at 11:33 PM
**To:** Burns, Carrie <cjburns@wustl.edu>
**Cc:** Patricia Brown <brownandrussell@verizon.net>, Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>, lawfinaid@georgetown.edu <lawfinaid@georgetown.edu>
**Subject:** Re: Tuition Agreement - Wash U Law and Georgetown Law

All,

I want to stress that time is of the essence to resolve this issue. School starts in less than 2 weeks. Somehow, Wash U has effectively revoked my scholarship, as Wash U, vis a vis Carrie Burns, has informed me that Georgetown "will not accept" (per an email, not the student handbook, nor any agreement that I signed) scholarship funds from Wash U. I have now been required to find another $37,000? Is there anyway that Georgetown can honor my scholarship from Wash U? Why is my scholarship suddenly not being honored/why was I not notified of this revocation before I signed and notified all of my other schools that I was not attending their institutions?

This is very concerning. I really need a consortium agreement that makes sense given my unique circumstances of it being unsafe for me to return to St. Louis. Additionally, I sent Georgetown a signed letter saying that I would withdraw from all other schools. However, I cannot in good conscience honor that agreement if Wash U is now going to revoke my scholarship per Carrie Burn's previous e-mail. I signed Georgetown's commitment letter under the pretenses that were sent to me from the registrar, Sarah Hellin– that the 12 credits that I am registered for through Wash U were solely for administrative purposes - for full-time status so that I could keep my scholarship/"financial aid purposes."

Please advise.

Allison Brown

49

**From:** Burns, Carrie <cjburns@wustl.edu>
**Date:** Tuesday, August 15, 2023 at 9:43 PM
**To:** Brown, Allison <allison.brown@wustl.edu>
**Subject:** RE: Tuition Agreement - Wash U

Hi Allison,

I'll just need you to sign and return this form to me. If you want to provide your mother's phone number I can give her a call.

Thanks,

Carrie

---

**From:** Brown, Allison <allison.brown@wustl.edu>
**Sent:** Tuesday, August 15, 2023 2:25 PM
**To:** Burns, Carrie <cjburns@wustl.edu>; Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>
**Subject:** Re: Tuition Agreement - Wash U

I give permission for Carrie Burns to talk to Patricia Brown, my mother, to discuss my bill.

Thanks,
Allison

**From:** Burns, Carrie <cjburns@wustl.edu>
**Date:** Tuesday, August 15, 2023 at 10:26 PM
**To:** Brown, Allison <allison.brown@wustl.edu>
**Cc:** Patricia Brown <brownandrussell@verizon.net>, Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>, lawfinaid@georgetown.edu <lawfinaid@georgetown.edu>
**Subject:** RE: Tuition Agreement - Wash U Law and Georgetown Law

Hi Allison,

Thanks! I will call your mother now.

Carrie

50

**From:** Brown, Allison <allison.brown@wustl.edu>
**Sent:** Tuesday, August 15, 2023 3:18 PM
**To:** Burns, Carrie <cjburns@wustl.edu>
**Cc:** Patricia Brown <brownandrussell@verizon.net>; Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>; lawfinaid@georgetown.edu
**Subject:** Re: Tuition Agreement - Wash U Law and Georgetown Law

Hi Carrie,

Please send me a copy of the consortium agreement. Also, my mother's phone number is 301-875-2658.

Also, per your email below, to visit another school, I would be responsible for paying the full tuition at both WUSTL and Georgetown as a visiting student, or $71479 per semester, although I am only attending one institution as a full time student, earning one year's worth of credits, and earning one law degree. That would amount to $142958 for a single year.  No one would ever study as a visiting student at another school if this were the case.

Applying my $18,500 scholarship to this would still have me paying 71479 - 18500 per semester in tuition, or 52979 a semester or 105958 tuition for a single year as a visiting student. I have not received a bill from Georgetown yet, but it seems ludicrous that in order to study there, I would need to pay two full tuitions.

I am looking forward to receiving a copy of the consortium agreement.

Thanks much and best,
Allison


**From:** Burns, Carrie <cjburns@wustl.edu>
**Sent:** Tuesday, August 1, 2023 7:11:46 PM
**To:** Brown, Allison <allison.brown@wustl.edu>; Georgetown Law Special Programs <lawspecialprograms@georgetown.edu>
**Subject:** RE: Tuition Agreement - Wash U

Hi Allison,

WashU will make payment (per the consortium agreement) to Georgetown. We will need the consortium agreement completed (by Georgetown) and returned from Georgetown and your tuition statement. Once we have both those items we can let you know what your total tuition amount will be.

Do you have a billing statement yet?

Carrie



**Carrie Burns** | She/Her/Hers
Director of Financial Aid & Student Life
**Washington University School of Law**
Office of Student Life | 314.935.4605
Meet with Me in Person | Meet with Me on Zoom

**Appendix G - Article of 4th Circuit Providing Counsel**



**Website accessed 9/26/2025**

**https://www.hunton.com/services/Litigation/Fourth-Circuit-Practice-US-Court-of-Appeals-for-the-Fourth-Circuit**